# SYLLABUS

This syllabus is not part of the Court's opinion. It has been prepared by the Office of the Clerk for the convenience of the reader. It has been neither reviewed nor approved by the Court. In the interest of brevity, portions of an opinion may not have been summarized.

## State v. David Chavies (A-25-20) (084999)

**Argued February 2, 2021 -- Decided July 12, 2021**

**FERNANDEZ-VINA, J., writing for the Court.**

In this case, the Court considers whether an inmate may be released from prison under Rule 3:21-10(b) while still in the process of serving a period of parole ineligibility imposed in accordance with the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

In connection with a 2014 shooting, defendant David Chavies was charged with murder, aggravated assault, and weapons offenses. In June 2016, defendant pled guilty to second-degree aggravated assault based on accomplice liability. His prison intake form indicated that his health was poor and that he suffered from asthma, sickle cell anemia, and a heart murmur. Defendant was sentenced to a ten-year term of imprisonment with an 85% period of parole ineligibility under NERA.

In May 2020, defendant filed a Rule 3:21-10(b)(2) motion for release from custody and, in the alternative, sought a judicial furlough until the COVID-19 pandemic subsided. Defendant provided voluminous medical documents in support of his motion showing he had been undergoing treatment for sickle cell anemia, asthma, latent tuberculosis, hypothyroidism, and a heart murmur.

The court determined that defendant was barred from relief under Rule 3:21-10(b)(2) because he had not yet served 85% of his sentence, the period of parole ineligibility, as mandated by NERA. The court also assessed the various factors for considering Rule 3:21-10(b)(2) motions set forth in State v. Priester, 99 N.J. 123 (1985), and found that defendant was not entitled to relief. The Appellate Division affirmed, and the Court granted certification. 244 N.J. 403 (2020).

**HELD:** NERA mandates that a defendant serve 85% of the sentence "actually imposed" for certain crimes before becoming eligible for parole. N.J.S.A. 2C:43-7.2(b). Allowing defendants to proceed with a Rule 3:21-10(b)(2) motion prior to serving that 85% would circumvent the Legislature's objectives and its approach to violent crimes. Moreover, the timing of defendant's motion aside, he failed to meet his burden under Priester since he cannot prove the necessary devastating effect that incarceration had on his health, in addition to various other Priester factors.

1

1.  Under NERA, "[a] court imposing a sentence of incarceration for a crime of the first or second degree enumerated in subsection (d) . . . shall fix a minimum term of 85% of the sentence imposed, during which the defendant shall not be eligible for parole." N.J.S.A. 2C:43-7.2(a).  Defendant's conviction for aggravated assault is covered under subsection (d).  Subsection (b) mandates further that the period of parole ineligibility "shall be calculated based upon the sentence of incarceration actually imposed."  N.J.S.A. 2C:43-7.2(b).  In State v. Mendel, the Appellate Division found that "a sentence cannot be changed or reduced under [Rule] 3:21-10(b) below the parole ineligibility term required by statute."  212 N.J. Super. 110, 112-13 (App. Div. 1986).  In the court's view, the Rule "was never intended to permit the change or reduction of a custodial sentence which is required by law."  Ibid.  And in State v. Brown, the Appellate Division held that a discretionary minimum period of incarceration could be modified but that courts are without jurisdiction to consider Rule 3:21-10(b) motions until any mandatory parole ineligibility period has been served.  384 N.J. Super. 191, 194, 196 (App. Div. 2006). (pp. 15-18)

2.  When sentencing a defendant pursuant to NERA, the court has discretion in setting the term that is used to calculate the period of parole ineligibility but has no discretion in determining the period of parole ineligibility.  NERA represents a clear mandate by the Legislature that those who commit the most violent of crimes must serve 85% of the sentence imposed -- their period of parole ineligibility -- before they are eligible for release under Rule 3:21-10(b)(2).  To permit defendant's release under Rule 3:21-10(b)(2) would effectively reduce his NERA sentence, which the Legislature and the plain language of NERA expressly forbid.  Further, allowing the sentencing court to resentence an individual to reduce the original sentence for the purpose of reducing the NERA period of parole ineligibility would thwart the clear and unambiguous language of the statute, as well as the expressed intent of the Legislature.  The recently enacted Compassionate Release Statute, N.J.S.A. 30:4-123.51e, provides that notice must be given to victims or the victims' families as to a petition for compassionate release so that they may present a statement at a hearing or testify in court.  Given the clear legislative intent that an inmate not be afforded compassionate release without such safeguards, the Court declines to permit defendant to seek release under Rule 3:21-10(b)(2) prior to the completion of his parole ineligibility period, as required by NERA.  (pp. 18-21)

3.  The Court finds that defendant's application cannot be considered before he has satisfied his mandatory minimum period of incarceration but provides guidance as to the Priester factors.  "The predicate for relief under [Rule 3:21-10(b)(2)] is proof of the serious nature of the defendant's illness and the deleterious effect of incarceration on the prisoner's health."  Priester, 99 N.J. at 135.  As to whether prison is harmful to a defendant's health, courts should consider "the availability of medical services in prison." Ibid.  Moreover, a defendant must demonstrate "changed circumstances in his [or her] health . . . since the time of the original sentence."  Id. at 136.  In considering a Rule 3:21-10(b)(2) motion, courts should also consider "the nature and severity of the crime,

2

the severity of the sentence, the criminal record of the defendant, the risk to the public if the defendant is released, and the defendant's role in bringing about his current state of health." Id. at 137.  (pp. 21-22)

4.  Here, the motion court did not abuse its discretion when it denied defendant's release under Priester.  As evidenced by defendant's over 1,000 pages of supporting medical documentation, there is no indication that defendant's prison would be unable to treat him should he contract COVID-19.  Additionally, nothing in the record establishes that defendant's health has drastically changed as a result of his incarceration.  And the motion court did not abuse its discretion in its analysis of the final Priester prong -- the weighing of various other factors such as the severity of the crime and sentence, defendant's criminal record, the risk to the public should he be released, and his role in bringing about his current state of health.  See id. at 137.  While defendant's medical conditions are beyond his control, the offense to which he pled guilty was serious and his escalating criminal record is also cause for concern.  In sum, the motion court properly balanced all of the Priester factors before denying defendant's Rule 3:21-10(b)(2) motion.  (pp. 22-24)

**AFFIRMED.**

**JUSTICE LaVECCHIA, dissenting**, would reverse and remand the disposition of defendant's application and issue an interim order immediately revising the language of Rule 3:21-10(b)(2).  The dissent views the majority's approach as ceding part of a court's authority to adjust a base term of a defendant's sentence whenever a NERA sentence is implicated.  The dissent observes that the Court has the constitutional authority, through its rulemaking powers, to amend Rule 3:21-10 -- a product of the Court's own creation -- and stresses that such an amendment would be consistent with the innate power of a court to resentence at any time.  So long as a resentenced defendant is not released during the NERA parole ineligibility period of 85% of a resentenced base term, the dissent states, a defendant should be able to utilize an application under subsection (b)(2) to seek release for medical reasons controlled through the Priester analysis.  In the dissent's view, NERA does not preclude a resentencing; it only precludes a release before 85% of the refixed base term is served in prison.  The dissent would immediately amend Rule 3:21-10 so it can be of meaningful use during a pandemic that is still sickening and killing people in this state and nation, as well as for use by future inmates who are seriously ill or infirm.

**CHIEF JUSTICE RABNER and JUSTICES PATTERSON and SOLOMON join in JUSTICE FERNANDEZ-VINA's opinion.  JUSTICE LaVECCHIA filed a dissent, in which JUSTICES ALBIN and PIERRE-LOUIS join.**

3

State of New Jersey,

Plaintiff-Respondent,

v.

David Chavies, a/k/a
David Q. Chavies, and,
Dave Chavies,

Defendant-Appellant.

On certification to the Superior Court,
Appellate Division.

| Argued | Decided |
|---|---|
| February 2, 2021 | July 12, 2021 |

John P. Flynn, Assistant Deputy Public Defender,
argued the cause for appellant (Joseph E. Krakora,
Public Defender, attorney; John P. Flynn, of counsel
and on the briefs).

Joseph Paravecchia, Assistant Prosecutor, argued the
cause for respondent (Angelo J. Onofri, Mercer County
Prosecutor, attorney; Randolph E. Mershon, III, Assistant
Prosecutor, of counsel and on the briefs, and Laura
Sunyak, Assistant Prosecutor, on the briefs).

Alexander Shalom argued the cause for amicus curiae
American Civil Liberties Union of New Jersey (American
Civil Liberties Union of New Jersey Foundation,

attorneys; Alexander Shalom and Jeanne LoCicero, on the brief).

Matthew F. Bruno argued the cause for amici curiae Medical and Public Health Experts (Greenberg Traurig, attorneys; Matthew F. Bruno, of counsel and on the brief).

Frank J. Ducoat, Special Deputy Attorney General/ Acting Essex County Assistant Prosecutor, argued the cause for amicus curiae County Prosecutors Association of New Jersey (Esther Suarez, President, County Prosecutors Association of New Jersey, attorney; Frank J. Ducoat, of counsel and on the brief).

Carol M. Henderson, Assistant Attorney General, argued the cause for amicus curiae Attorney General of New Jersey (Gurbir S. Grewal, Attorney General, attorney; Carol M. Henderson, of counsel and on the brief).

JUSTICE FERNANDEZ-VINA delivered the opinion of the Court.

In this case, the Court determines whether an inmate may be released from prison under Rule 3:21-10(b) when that inmate is still in the process of serving a period of parole ineligibility imposed in accordance with the No Early Release Act (NERA), N.J.S.A. 2C:43-7.2.

According to Rule 3:21-10(b)(2), "[a] motion may be filed and an order may be entered at any time . . . amending a custodial sentence to permit the release of a defendant because of illness or infirmity of the defendant." Here, defendant David Chavies argues that because he has been diagnosed with

asthma, latent tuberculosis, and sickle cell anemia, and is at a higher risk for serious illness or death should he contract COVID-19 in prison, he should be released. The issue is whether defendant's application for release under the Rule should have been granted, despite the fact that he had not yet served 85% of his sentence imposed at the time of his application, as required by NERA.

The Appellate Division held that relief under Rule 3:21-10(b)(2) is available only to inmates who had first served their mandatory parole ineligibility term and that the trial judge "correctly determined defendant did not meet his burden under [State v. Priester, 99 N.J. 123 (1985)] or [State v. Boone, 262 N.J. Super. 220 (Law Div. 1992)] to warrant the relief he requested."

We agree. NERA mandates that a defendant serve 85% of the sentence "actually imposed" for certain crimes before becoming eligible for parole. N.J.S.A. 2C:43-7.2(b). Allowing defendants to proceed with a Rule 3:21-10(b)(2) motion prior to serving that 85% would circumvent the Legislature's objectives and its approach to violent crimes. Moreover, the timing of defendant's motion aside, he failed to meet his burden under Priester since he cannot prove the necessary devastating effect that incarceration had on his health, in addition to various other Priester factors.

Therefore, we affirm the judgment of the Appellate Division.

3

I.

A.

We begin by summarizing the pertinent facts and procedural history. On October 20, 2014, Trenton police responded to a report of gun shots at a deli. Upon their arrival, the officers discovered two gunshot victims, both claiming to be innocent bystanders. Both individuals were transported to a nearby hospital where they were treated for non-life-threatening injuries.

One victim told detectives that he noticed three or four men, all wearing ski masks, walk toward the deli prior to the shooting. The men then opened fire on him as he ran toward the back of the store. At the time of the shooting, there were three other customers inside the deli as well as three employees. Surveillance footage captured the suspected vehicle -- a gold Chevrolet Trailblazer -- and revealed three individuals wearing black clothing walking toward the vehicle following the shooting. Defendant was identified as one of the individuals walking back to the car and arrested the same day as the shooting.

Defendant was charged with two counts of first-degree murder, contrary to N.J.S.A. 2C:11-3; six counts of second-degree aggravated assault, contrary to N.J.S.A. 2C:12-1(b)(1); second-degree possession of a weapon for an unlawful purpose, contrary to N.J.S.A. 2C:39-4(a); and second-degree

4

unlawful possession of a weapon, contrary to N.J.S.A. 2C:39-5(b).  On June 2, 2016, defendant pled guilty to a final amended charge of second-degree aggravated assault based on accomplice liability, contrary to N.J.S.A. 2C:12-1(b)(1) and 2C:2-6(a).

Defendant's prison intake form, dated August 2, 2016, indicated that his health was poor and that he suffered from asthma, sickle cell anemia, and a heart murmur.

Three days later, on August 5, 2016, defendant was sentenced to a ten-year term of imprisonment with an 85% period of parole ineligibility under NERA.  Additionally, the court imposed a three-year period of parole supervision following defendant's release.  In sentencing defendant, the court found applicable aggravating factors three, the risk that defendant will reoffend; six, the extent of defendant's criminal record and the seriousness of his current offense; and nine, the need to deter future offenses.  See N.J.S.A. 2C:44-1(a)(3), (6), (9).  The court found no mitigating factors.  The court also found that defendant had accumulated 655 days in time credits since being taken into custody on October 20, 2014.

B.

In May 2020, defendant filed a Rule 3:21-10(b)(2) motion for release from custody and, in the alternative, sought a judicial furlough under Boone,

5

262 N.J. Super. 220, until the COVID-19 pandemic subsided. Defendant provided voluminous medical documents in support of his motion showing he had been undergoing treatment at Garden State Youth Correctional Facility for sickle cell anemia, asthma, latent tuberculosis, hypothyroidism, and a heart murmur.

In denying the motion and furlough request, the court first denied defendant's request for a hearing, given the quality of the written submissions and the over 1,000 pages of medical records submitted. Citing State v. Mendel, 212 N.J. Super. 110, 113 (App. Div. 1986), the court next determined that defendant was barred from relief under Rule 3:21-10(b)(2) because he had not yet served 85% of his sentence, the period of parole ineligibility, as mandated by NERA.

Although the court determined that by virtue of NERA, defendant could not be released from prison without serving 85% of his custodial term, it still assessed the various factors for considering Rule 3:21-10(b)(2) motions as set forth in Priester, 99 N.J. 123. First, the court found that defendant's conditions were serious and could potentially place him at a higher risk for serious illness or death should he contract COVID-19 in prison. The Court also acknowledged, citing In re Request to Modify Prison Sentences, 242 N.J.

6

357, 379 (2020), that the COVID-19 pandemic constituted a change in circumstances under Priester.

Ultimately, however, the court determined that while defendant's "health may have deteriorated, he [did] not show[] that incarceration [was] the cause." The court understood defendant's motion as being based on the future fear of contracting COVID-19 while incarcerated. Additionally, the court noted there was no lifesaving drug that was available to the public yet unavailable to defendant and that defendant's argument that the public had greater access to preventative care and treatment for COVID-19 could not support his release. The court also noted the violent nature of defendant's offenses, the stance the Legislature took against such offenses in enacting NERA, and the "disturbing escalation" of defendant's criminal history -- from drug possession to possession of a machine gun to the current offense -- all of which the court found to weigh against defendant's release. The court concluded that defendant was a danger to the public under the Priester analysis and was thus not entitled to relief under Rule 3:21-10(b)(2).

As for defendant's alternative request for a judicial furlough, which is not the subject of defendant's current appeal, the court emphasized that defendant did not presently face near-certain death or even require additional medical treatment, contrary to the facts in Boone.

7

The Appellate Division affirmed for substantially the same reasons cited by the motion court. The panel noted that relief under Rule 3:21-10(b)(2) was not available "until a mandatory period of parole ineligibility has been served." According to the Appellate Division, although Mendel involved a Rule 3:21-10(b)(1) motion and a defendant who had sought to change his sentence to facilitate drug treatment, it also provided support for the motion court's conclusion that Rule 3:21-10(b)(2) could not be used to reduce defendant's term below the mandatory parole ineligibility period.

Moreover, the panel found that defendant failed to meet his burden for relief under both Priester and Boone and that the motion court appropriately exercised its discretion in denying defendant's motion and furlough request. Last, the Appellate Division rejected defendant's request for a remand to conduct a hearing on his Rule 3:21-10(b)(2) motion, finding that the motion court's decision to rely on the parties' submissions was "overwhelmingly supported by the record."

We granted defendant's petition for certification. 244 N.J. 403 (2020). We also granted leave to participate as amici curiae to the American Civil Liberties Union of New Jersey (ACLU), a collectively represented group of medical and public health experts, the Attorney General, and the County Prosecutors Association of New Jersey.

8

II.

A.

Defendant first argues that he satisfies the medical predicates required for relief under Rule 3:21-10(b)(2): a serious illness and prison's deleterious effects on his health, along with a change in circumstances since the time of sentencing. According to defendant, it is "the existence of [a] serious threat to defendant's physical condition, rather than the prison system's ability to provide beneficial and desirable medical services, . . . that is determinative of a Rule 3:21-10(b)(2) motion." Further, defendant contends that the motion court misconstrued this Court's reference, in Request to Modify, to generalized fears of contracting the virus being insufficient to warrant relief as, instead, requiring that a defendant actually contract the virus. Defendant maintains that "[w]hile an otherwise healthy inmate might only have a 'generalized fear' of contracting COVID-19, a medically vulnerable individual with underlying conditions can establish increased health risks posed by incarceration during this pandemic."

In response to amici the Attorney General and the County Prosecutors Association, defendant urges this Court to find that a defendant may satisfy the medical predicates for relief under Rule 3:21-10(b)(2) by showing (1) that his

9

underlying medical conditions exacerbate the risks of COVID-19 and (2) that continued incarceration increases the risk of contracting the virus.

Finally, defendant argues that the "Appellate Division has consistently, and erroneously, relied on [Mendel] to hold that defendants are procedurally barred from medical release under Rule 3:21-10(b)(2) when serving a mandatory period of parole ineligibility." He distinguishes Rule 3:21-10(b)(1), which was the subject of Mendel, from Rule 3:21-10(b)(2) on the ground that the former permits changing a sentence to facilitate entrance into a drug treatment program while the latter permits release. Defendant maintains that Rule 3:21-10(b)(2) was "intended to codify a court's inherent authority, similar to the Governor's clemency power, to release an ill or infirm inmate at any time." Accordingly, in defendant's view, a defendant cannot be categorically barred from release by a mandatory period of parole ineligibility, but rather a court may consider a NERA sentence when weighing the factors for and against their release. Defendant asserts that Rule 3:21-10(b)(2) "embodies the judiciary's inherent power to release an infirm individual from prison and does not involve a resentencing." He claims that it would be "grossly unfair" to conclude that the Legislature intended to bar defendants from relief solely for failure to complete their mandatory minimum sentences

and notes that <u>Rule</u> 3:21-10(b)(2) is, for defendants like him, the lone avenue for relief during the pandemic.

B.

Amicus curiae the ACLU aligns itself with defendant and argues that the motion court and Appellate Division have "forced movants to surmount an impossible threshold:  wait until you actually have contracted COVID-19 . . . before you can satisfy the medical predicates for relief."  The ACLU contends there is no binding, on-point authority requiring completion of a term of statutorily mandated parole ineligibility before seeking relief under <u>Rule</u> 3:21-10(b)(2).  Instead, the ACLU compares <u>Rule</u> 3:21-10(b)(2) to a gubernatorial pardon, and argues that the rule empowers courts to release defendants at any time due to illness or infirmity.  Last, the ACLU argues that the motion court erred in evaluating defendant's medical conditions by focusing on the prison system's ability to treat his existing and potential future health issues and considering his claim of serious comorbidities as a mere allegation that he may contract the virus in the future.  The ACLU contends that reliance on defendant's ability to be treated for his sickle cell anemia in prison ignores both that, under <u>State v. Tumminello</u>, 70 N.J. 187, 193 (1976), a defendant's access to prison medical care is not determinative and that defendant's conditions place him at greater risk of death should he contract COVID-19.

11

C.

An amicus group of medical and public health experts also aligns itself with defendant. The group argues that any one of defendant's medical conditions, taken alone, would significantly impact his ability to fight COVID-19, and stresses that social distancing is "essentially impossible in prisons." According to these experts, requiring that a defendant be infected with the virus is inconsistent with the purpose of Rule 3:21-10(b)(2), which predicates relief on the outcome individuals seek to avoid.

D.

The State first emphasizes that "defendants who are required to serve a statutorily mandated period of parole ineligibility cannot be released from prison under [Rule 3:21-10(b)(2)] until they have completed the required term of incarceration delineated by the statute." The State maintains that in Mendel, the Appellate Division concluded that Rule 3:21-10(b) may not be used to amend sentences so that they fall below the mandatory term of parole ineligibility.

The State further stresses that even if the mandatory period of parole ineligibility did not serve as a barrier to defendant's motion, he fails to satisfy the Priester factors. Although the State does not contest defendant's medical conditions and the health risks posed by COVID-19, it argues that defendant

12

has offered no evidence that he cannot receive proper treatment in prison should he contract the virus or, as noted by the motion court, that imprisonment is causing his health to deteriorate.  Rather, the State submits that defendant's voluminous medical records demonstrate the appropriate medical care he has received in prison.

E.

The Attorney General aligns with the State and argues that limiting Mendel's applicability to Rule 3:21-10(b)(1) alone would, incongruously, make it more difficult for defendants to seek admission into a drug treatment program than to seek a full release.  The Attorney General emphasizes that mandatory periods of parole ineligibility apply to some of the State's most violent offenders and represent legislative consideration of the seriousness of those offenses.

F.

Amicus curiae the County Prosecutor's Association also supports the State's position and contends the sentencing discretion of courts is limited by the Legislature's imposition of mandatory periods of parole ineligibility.  The Association cites a report from the Supreme Court's Committee on Criminal Practice in support of its argument that a Rule 3:21-10(b) order "cannot be entered reducing a mandatory jail term."  Relying on Mendel, which it

13

contends prohibits changes or reductions in sentences prior to the completion of the mandated parole ineligibility, the County Prosecutor's Association argues that Rule 3:21-10(b) "was never intended to permit the change or reduction of a custodial sentence which is required by law."

## III.

"As with sentencing, the scope of appellate review of a trial court's decision to grant or deny a Rule 3:21-10(b)(2) motion is whether the trial court abused its discretion." Priester, 99 N.J. at 137. Since Rule 3:21-10(b)(2) "offers extraordinary relief to" prisoners, it "must be applied prudently, sparingly, and cautiously." Id. at 135. A court abuses its discretion when its "decision is 'made without a rational explanation, inexplicably departed from established policies, or rested on an impermissible basis.'" State v. R.Y., 242 N.J. 48, 65 (2020) (quoting Flagg v. Essex Cnty. Prosecutor, 171 N.J. 561, 571 (2002)).

## A.

We begin by addressing whether a defendant may obtain relief under Rule 3:21-10(b)(2) when that defendant has not yet completed a statutorily mandated period of parole ineligibility under NERA.

14

1.

Under NERA, "[a] court imposing a sentence of incarceration for a crime of the first or second degree enumerated in subsection (d) of this section shall fix a minimum term of 85% of the sentence imposed, during which the defendant shall not be eligible for parole." N.J.S.A. 2C:43-7.2(a). Defendant's conviction for aggravated assault is covered under subsection (d) N.J.S.A. 2C:43-7.2(d)(4). Subsection (b) mandates further that the period of parole ineligibility "shall be calculated based upon the sentence of incarceration actually imposed." N.J.S.A. 2C:43-7.2(b). Given that Rule 3:21-10 "must be read in light of those provisions of the Code of Criminal Justice which require parole ineligibility terms," when "a parole ineligibility term is required or mandated by statute, an application may not be granted under Rule 3:21-10(b) so as to change or reduce that sentence." Mendel, 212 N.J. Super. at 113.

In Mendel, the defendant was serving concurrent eight-year sentences for robbery convictions -- each with a four-year parole ineligibility period pursuant to the Graves Act. Id. at 112. Less than three years into his term, the defendant filed a motion under Rule 3:21-10(b)(1).[1] Ibid. The court noted

---

[1] Rule 3:21-10(b)(1) provides for "changing a custodial sentence to permit entry of the defendant into a custodial or non-custodial treatment or rehabilitation program for drug or alcohol abuse."

15

there was a difference between a parole ineligibility period mandated by statute and one imposed as a matter of the court's discretion.  Id. at 112-13.  Although the appellate court acknowledged that Rule 3:21-10(b)(1) motions could be considered when the defendant was serving a discretionary period of parole ineligibility, it found that "a sentence cannot be changed or reduced under [Rule] 3:21-10(b) below the parole ineligibility term required by statute."  Ibid.  In the court's view, the Rule "was never intended to permit the change or reduction of a custodial sentence which is required by law."  Ibid.  Accordingly, the Appellate Division held that since "the defendant was still serving the three-year minimum ineligibility term required by the Graves Act in this case, the court could not change or reduce the sentence under [Rule] 3:21-10(b)(1) at the time the application was filed."  Id. at 114 (citation omitted).

In State v. Brown, the Appellate Division considered whether, under the Graves Act, N.J.S.A. 2C:43-6(c), a minimum term of imprisonment greater than one-third of a sentence for the predicate crime was mandatory, and therefore not subject to modification, or discretionary, therefore permitting consideration of a Rule 3:21-10(b)(1) motion.  384 N.J. Super. 191, 192 (App. Div. 2006).  Significantly, at the time of the defendant's sentencing in Brown, the Graves Act provided in relevant part that a defendant's "term of

16

imprisonment shall include the imposition of a minimum term. The minimum term shall be fixed at, or between, one-third and one-half of the sentence imposed by the court or three years." N.J.S.A. 2C:43-6(c) (1997). The Brown court thus confronted whether a Rule 3:21-10(b)(1) motion could be entertained with respect to the fraction of the defendant's sentence that fell between the one-third and one-half range established by the Graves Act.[2]

In Brown, the defendant held up a restaurant with a shotgun while his accomplice stole cash from the register. Ibid. The defendant fired the gun before leaving, wounding two employees. Id. at 192-93. He pled guilty to attempted murder and robbery and was sentenced to a twenty-year term with a ten-year mandatory minimum pursuant to the Graves Act. Id. at 193. The defendant thereafter moved under Rule 3:21-10(b)(1) to have his sentence changed so that he could enter a drug-treatment program. Ibid. The State opposed the motion on the ground that the defendant had not yet completed his ten-year parole ineligibility period, and the court denied the motion. Ibid.

The Appellate Division reversed, holding that,

> [i]n this case the Graves Act sentence mandated a minimum period of parole ineligibility "at, or between," six and two-thirds years and ten years, and the determination to impose the maximum ten-year

---

[2] The current iteration of the statute directs that the mandatory term "be fixed at one-half of the sentence imposed by the court or 42 months, whichever is greater." N.J.S.A. 2C:43-6(c) (2021).

period was an exercise of sentencing discretion clearly based on the conduct of the defendant and the serious injury to one of the victims. Accordingly, we hold that since the defendant has served in excess of the mandatory minimum parole ineligibility term of one-third of his base term and is now serving the narrow discretionary period of his sentence, the trial court has jurisdiction to consider his [Rule] 3:21-10(b)(1) application for modification of his custodial sentence to permit his entry into a substance abuse treatment program in accordance with the standards for consideration of such an application.

[Id. at 196.]

Significantly, the Appellate Division based its decision in Brown on the statutory scheme, which required a one-third minimum but left the option of increasing the minimum period of incarceration, up to one-half of the defendant's sentence, to the discretion of the court. The court did not find in Brown that the one-third sentence could be modified. On the contrary, citing Mendel and its progeny, the Appellate Division held that courts are without jurisdiction to consider Rule 3:21-10(b) motions until any mandatory parole ineligibility period has been served. Id. at 194.

2.

Applying the principles stated in the case law, we conclude that the 85% parole ineligibility period represents a period of parole ineligibility that is mandated by NERA and that a defendant may therefore not file a motion under Rule 3:21-10(b)(2) until after serving that time.

18

The 85% parole ineligibility period is calculated using the sentencing term "actually imposed" by the sentencing court. See N.J.S.A. 2C:43-7.2(b) (emphasis added). Although the sentencing court has discretion in setting the term that is thus used to calculate the period of parole ineligibility, the sentencing court has no discretion in determining the period of parole ineligibility. See N.J.S.A. 2C:43-7.2(a) (stating that in sentencing a defendant to one of the enumerated crimes, the sentencing court "shall fix a minimum term of 85% of the sentence imposed"). The sentencing court is thus required to sentence a defendant to an 85% period of parole ineligibility. Allowing defendants to file a motion under Rule 3:21-10(b)(2) to amend such NERA sentences would encroach upon the Legislature, which intended "to increase prison time for offenders committing the most serious crimes in society." S. 855 (1996).

In our view, NERA represents a clear mandate by the Legislature that those who commit the most violent of crimes must serve 85% of the sentence imposed -- their period of parole ineligibility -- before they are eligible for release under Rule 3:21-10(b)(2). To permit defendant's release in this instance under Rule 3:21-10(b)(2) would effectively reduce his NERA sentence, which the Legislature and the plain language of NERA expressly forbid. See N.J.S.A. 2C:43-7.2(a) (the court "shall fix a minimum term of

19

85% of the sentence imposed" for the period of parole ineligibility); see also In re H.D., 241 N.J. 412, 418 (2020) ("Where 'a statute's plain language is clear, we apply that plain meaning and end our inquiry.'" (quoting Garden State Check Cashing Serv., Inc. v. Dep't of Banking & Ins., 237 N.J. 482, 489 (2019))).

Further, allowing the sentencing court to resentence an individual to reduce the original sentence for the purpose of reducing the NERA period of parole ineligibility would thwart the clear and unambiguous language of the statute, as well as the expressed intent of the Legislature.

Our conclusion is further supported by the Legislature's recent enactment of the Compassionate Release Statute, N.J.S.A. 30:4-123.51e. The statute addresses the issue of an inmate's diagnosis, id. at (b), the process for petitioning for compassionate release after a qualifying diagnosis, id. at (d), and the process by which an inmate may be returned to confinement, id. at (j), among other provisions, see generally id. at (a) to (l). Of particular note, in stark contrast to Rule 3:21-10, the Compassionate Release Statute provides that, upon the filing of a petition for compassionate release, notice must be given to victims or the victims' families so that they may present a statement at a hearing or testify in court as to the petition for compassionate release. See id. at (e)(2). Given the clear legislative intent that an inmate not be afforded

compassionate release without such safeguards, we further decline to permit defendant to seek release under Rule 3:21-10(b)(2) prior to the completion of his parole ineligibility period, as required by NERA.

The dissent acknowledges that trial judges cannot release a defendant serving a mandatory period of parole ineligibility under NERA.  Post at ___ (slip op. at 8-9)  The dissent proposes a workaround that would have the same effect.  In doing so it does not thoroughly consider the Court's lack of authority to resentence such defendants through the rulemaking process.  Neither a committee report from 1975 nor generic language about a court's inherent power offers support for reducing mandatory NERA terms.  Id. at ___ (slip op. at 6).  Further review by a committee will not change that.

### B.

Although we find that defendant's application cannot be considered before he has satisfied his mandatory minimum period of incarceration, we nevertheless consider, by way of guidance, whether defendant satisfies the Priester factors.

### 1.

"The predicate for relief under [Rule 3:21-10(b)(2)] is proof of the serious nature of the defendant's illness and the deleterious effect of incarceration on the prisoner's health."  Priester, 99 N.J. at 135.  As to whether

21

prison is harmful to a defendant's health, courts should consider "the availability of medical services in prison." Ibid. That factor is significant "only insofar as it tends to establish that without such medical services the defendant's condition will seriously worsen or deteriorate in prison." Ibid. A successful Rule 3:21-10(b)(2) motion requires the prisoner to prove "that the medical services unavailable at the prison would be not only beneficial . . . but are essential to prevent further deterioration in his health." Ibid. Moreover, a defendant must demonstrate "changed circumstances in his [or her] health . . . since the time of the original sentence." Id. at 136.

In considering a Rule 3:21-10(b)(2) motion, courts should also consider "the nature and severity of the crime, the severity of the sentence, the criminal record of the defendant, the risk to the public if the defendant is released, and the defendant's role in bringing about his current state of health." Id. at 137.

## 2.

Applying those guiding principles, we conclude that the motion court did not abuse its discretion when it denied defendant's release under Priester.

We acknowledge that defendant's medical conditions, taken together, are sufficiently serious and place him at a greater risk for complications than that faced by others, should he contract COVID-19. And, as indicated in Request

to Modify, the COVID-19 pandemic is a change in circumstances for Priester purposes. 242 N.J. at 379.

However, as the motion court found, and as evidenced by defendant's over 1,000 pages of supporting medical documentation, there is no indication that defendant's prison would be unable to treat him should he contract COVID-19. Additionally, nothing in the record establishes that defendant's health has drastically changed as a result of his incarceration. See Priester, 99 N.J. at 141 ("[I]t is only the devastating impact of incarceration on a prisoner's health that permits the application of [Rule 3:21-10(b)(2)]."); see also State v. Trippiedi, 204 N.J. Super. 422, 428 (App. Div. 1985) ("Where the prison system can provide beneficial and desirable medical care, incarceration does not threaten further deterioration in defendant's health.").

Last, we conclude that the motion court did not abuse its discretion in its analysis of the final Priester prong -- the weighing of various other factors such as the severity of the crime and sentence, defendant's criminal record, the risk to the public should he be released, and his role in bringing about his current state of health. See Priester, 99 N.J. at 137. While defendant's medical conditions are beyond his control, defendant pled guilty to second-degree aggravated assault based on accomplice liability for the shooting of two innocent bystanders. Given that aggravated assault is one of the enumerated

23

NERA crimes under subsection (d), defendant's NERA sentence reflects the severity of his crime. See N.J.S.A. 2C:43-7.2(d)(4). Moreover, as the motion court concluded, we find that defendant's ten-year sentence is substantial and reflects the serious nature of his crime.

Defendant's criminal record is also cause for concern. In 2015, he was convicted of third-degree possession of a controlled dangerous substance and, just prior to the current second-degree aggravated assault, was found to be in possession of a machine gun. As the motion court found, such a pattern signals a "disturbing escalation of [d]efendant's aberrant conduct." Given this escalation, we conclude that the motion court did not abuse its discretion in finding that releasing defendant would place the public at risk.

In sum, the motion court properly balanced all of the Priester factors before denying defendant's Rule 3:21-10(b)(2) motion and it did not abuse its discretion in doing so.

## IV.

The judgment of the Appellate Division is affirmed.

CHIEF JUSTICE RABNER and JUSTICES PATTERSON and SOLOMON join in JUSTICE FERNANDEZ-VINA's opinion. JUSTICE LaVECCHIA filed a dissent, in which JUSTICES ALBIN and PIERRE-LOUIS join.

24

State of New Jersey,

Plaintiff-Respondent,

v.

David Chavies, a/k/a
David Q. Chavies, and,
Dave Chavies,

Defendant-Appellant.

JUSTICE LaVECCHIA, dissenting.

A court's power to resentence a defendant is as inherent a feature of judicial authority as the power to sentence at all. Rule 3:21-10 is an expression of that authority. State v. Priester, 99 N.J. 123, 135 (1985). For example, Rule 3:21-10(b) permits resentencing at any time when on joint application of a defendant and prosecuting attorney for good cause shown, to change a custodial sentence to permit entry into the Intensive Supervision Program, and to permit entry into a drug or rehabilitation program. It is the majority, not the dissent, that is mistaken about the scope of this Court's authority to promulgate rules about resentencing.

The majority's approach here cedes part of a court's authority to adjust a base term of a defendant's sentence whenever a No Early Release Act

(NERA), N.J.S.A. 2C:43-7.2, sentence is implicated. I do not believe the Court should surrender its authority to act in these circumstances and adjust our Court Rule. Our Court Rule is subject to further amendment to add to the circumstances under which a defendant's base term may be re-examined, as even the Attorney General's representative readily agreed at oral argument in this matter. And, when the base term of a defendant's sentence comes down, so does the NERA period of parole ineligibility.

This Court has the constitutional authority, through its rulemaking powers, to amend the Rule to permit the resentencing of a seriously ill or infirm inmate and provide medical release. Any resentencing of the base custodial term of a defendant's sentence concededly, would adjust the required 85% parole ineligibility period of any reduced resentence for a defendant. In compliance with NERA's language, medical release could not occur during an unserved portion of the adjusted 85% parole ineligibility period of a reduced custodial term. But if 85% of the reduced base custodial term has been served, there is no impediment to the medical release. Viewed in that light, the conflict with the Legislature feared by the majority does not exist.

We are dealing with a rule of our own construction. This Court should utilize its rulemaking authority to clarify that Rule 3:21-10 with all its subsection (b) exceptions -- a product of the Court's own creation -- is, at

2

bottom a resentencing vehicle. As such, and consistent with the innate power of a court to resentence <u>at any time</u>, we should recognize the need to immediately amend the Rule so it can be of meaningful use during a pandemic that is still sickening and killing people in this state and nation, as well as for use by future inmates who are seriously ill or infirm. I would amend the Rule with an interim order to accompany this opinion and implement a permanent rule amendment with the assistance of the Criminal Practice Committee.

Respectfully, I dissent.

I.

The modern iteration of <u>Rule</u> 3:21-10 was created by this Court in 1975. We have the benefit of a thoughtful Criminal Practice Committee Report memorializing the reasons for the recommended rule amendments that were adopted by the Court. <u>See generally</u> <u>Report of the New Jersey Supreme Court's Committee on Criminal Practice</u> (1975) (<u>1975 Report</u>). As has been noted, section (a) creates judicial time limits for the bringing of a motion for the resentencing of a defendant. <u>Id.</u> at 38-39. Section (b) sets forth the circumstances in which the Court's own <u>Rule</u> authorizes a court to resentence an individual post-conviction, notwithstanding section (a)'s time limit on such applications. <u>Id.</u> at 39, 41. There are several exceptions. Notably, subsection (b)(3) permits a defendant to seek resentencing at any time with the consent of

3

the prosecutor. Plainly, the Court viewed itself as having the authority to create exceptions that are not limited to correction of illegal sentences, which were problematic from the outset.

Our attention here is on subsection (b)(2), which utilizes different language than the other subsections. Whereas the other exceptions speak to a court's ability to change, correct, or reduce a sentence, see (b)(1) ("changing"), (3) ("changing"), (4) ("changing"), (5) ("correcting"), (6) ("changing"), (7) ("changing or reducing"), subsection (b)(2) authorizes a court on motion to enter an order "amending a custodial sentence to permit the release of a defendant because of illness or infirmity of the defendant." Despite the various verbs, subsection (a) of the Rule nonetheless refers to the exceptions, collectively, as motions "to reduce or change a sentence." That would seemingly include (b)(2) among the provisions that implicitly carry the ability to resentence and thereby reduce or change an original sentence. But the differently structured language has resulted in an understanding of subsection (b)(2)'s application as limited to authorizing release of an inmate when medically justified.

This Court, in Priester, structured a two-part test to be utilized when a court considers an application for the release of an inmate under subsection (b)(2). 99 N.J. at 135-37. The Priester decision established the standard by

4

which a court reviews, under (b)(2), the post-conviction effects on an imprisoned defendant's physical or mental health when determining whether to amend a sentence to permit the release of a defendant because of illness or infirmity. Id. at 135-36. That said, courts have held that, as presently worded, (b)(2) speaks only to release and not to the reduction of a sentence. Id. at 140-41 (holding that once medical conditions did not justify inmate's immediate release, a court did not have authority under (b)(2) to excise a parole ineligibility term to facilitate earlier Parole Board review for release); see also State v. Jarbath, 114 N.J. 394, 411 (1989) (citing Priester for the proposition that the Rule does not provide a basis for "challeng[ing] the original sentence but is reserved only for post-sentence circumstances"); State v. Sanducci, 167 N.J. Super. 503, 510-12 (App. Div. 1979) (stating that Rule 3:21-10(b)(2) speaks only to release, so when medical conditions do not merit release, a reduction in sentence is not permitted absent prosecutor consent).

## II.

No doubt, those past decisions took a limited view of a court's power to consider the post-conviction release of an inmate under (b)(2) utilizing the Priester factors as the necessary prerequisites for release. This Court should recognize that the remedy sought by defendant and other applicants like him is in our hands to deliver.

Priester, the case that both the majority and I recognize as the seminal case construing the Rule, recognized that the Rule "is an extension of the sentencing power of the court, involving the same complexity as the sentencing decision and the same delicate balancing of various factors." 99 N.J. at 135; see also State v. Tumminello, 70 N.J. 187, 193-94 (1976). Such an understanding of the Rule is consistent with the 1975 Report.

Although Committee Reports do not bind the Court, we have relied on such reports in the past. Robertelli v. N.J. Off. of Attorney Ethics, 224 N.J. 470, 484 (2016) ("If the text of the rules is ambiguous, we can turn to extrinsic evidence, including committee reports, for guidance."). The 1975 Report makes clear that the traditional understanding of Rule 3:21-10(b)(2) was that the Rule is a manifestation or articulation of the courts' power to amend criminal sentences at any point in time. 1975 Report at 41-44 (quoting, among other cases, United States v. Benz, 282 U.S. 304, 311 (1931); United States v. Ellenbogen, 390 F.2d 537, 540 (2d Cir. 1968)). Specifically, the Committee asserted "that the power of the judicial branch to make its own rules of procedure may be used to continue jurisdiction of a case, at least insofar as its right to reconsider a sentence imposed." 1975 Report at 42-43; see id. at 41 ("[T]he courts have the inherent power, subject to any limits set down by the Supreme Court, to reduce or change a sentence at any time."); see also State v.

6

Howard, 110 N.J. 113, 123 (1988) ("Sentencing remains a judicial function . . . ."); State v. McCrary, 97 N.J. 132, 139 (1984) (describing the "'judicial power . . . vested in this Court . . . as the repository of the judicial power to fashion remedies. In no context is this judicial power to fashion remedies more appropriately exercised than in a criminal case." (citation omitted)). To that end, Rule 3:21-10(b)(2)'s Committee Report discusses how the amendments were intended to facilitate a court's inherent ability to secure individualized relief from imprisonment for inmates suffering from serious illness or injury, here made worse for defendant by the pandemic, or for other reasons affecting future defendants.

It was with this understanding of the judicial power that the Committee recommended that "Rule 3:21-10(b)(2), as proposed, would permit a custodial sentence to be amended to allow the release of a defendant because of illness or infirmity of the defendant." 1975 Report at 44. The Committee recognized that the judicial power of the courts is distinguishable from that of the Parole Board, which does not exercise the judicial power as such, and "can only act after the statutorily prescribed term prerequisite to parole has been served." Ibid.

Accordingly, as the Committee understood it, the Rule, as an articulation of the courts' authority to enter and reopen sentences, would permit a court to

7

amend a sentence "to allow the release of a defendant because of illness or infirmity of the defendant." Ibid.

The Court adopted the Rule that the Committee recommended. As noted, however, this Court applied (b)(2) in a limited fashion in Priester, authorizing release, but, when release was not warranted, not authorizing a reduction in the defendant's sentence.

Since the Rule was adopted, the Appellate Division delivered two opinions interpreting when release is permissible without undermining a mandatory period of parole supervision. State v. Mendel established that a mandatory period of parole supervision bars release under subsection (b)(2) of the Rule. 212 N.J. Super. 110, 112-14 (App. Div. 1986). State v. Brown explored the meaning of mandatory parole supervision, distinguishing it from portions of a period of parole ineligibility that is within a sentencing court's ability to decide. 384 N.J. Super. 191, 194-96 (App. Div. 2006).

Accepting, as the majority does, that Mendel[1] and Brown are good law, ante at ___ (slip op. at 15-18), I would agree that a court may not "release" a

---

[1] Mendel was cited as good law by this Court only once before in State v. Cannon, but the citation was for the central holding of Mendel. See Cannon, 128 N.J. 546, 552 (1992) (citing Mendel in support of the proposition that "[a] defendant is not eligible if sentenced to a statutorily mandated period of parole ineligibility"), superseded by statute on other grounds by L. 1993, c. 123, § 2a(3).

8

defendant during a period of parole supervision prescribed entirely by the Legislature and therefore is truly mandatory. In the instant matter, which involves the application of NERA's period of parole ineligibility, I would also agree that release is not permitted under (b)(2) before a defendant has served 85% of the sentence imposed, as called for by NERA. But that simplistic statement does not fully address the problem that defendant presents to this Court.

NERA's 85% parole disqualifier moves with the sentence "actually imposed." In NERA, the Legislature understood that the mandatory fixed period of parole ineligibility applies to the base sentence imposed by the court. Whereas the majority goes to pains to explain what the Legislature did do through the enactment of NERA, it also bears noting what the Legislature did not do. The Legislature did not make NERA's parole ineligibility period a mandatory 85% of the minimum of the sentencing range applicable to a defendant, or to the maximum of the sentencing range applicable to a defendant, or any fixed amount of time (as was done for the required five-year period of post-incarceration parole supervision).[2] Rather, the Legislature

---

[2] The Graves Act's parole disqualifier, an earlier version of which was the provision at issue in Mendel, is a particularly resonant example of such a fixed parole disqualifier. See N.J.S.A. 2C:43-6(c) ("A person who has been convicted under [certain subsections] shall be sentenced to a term of imprisonment by the court. The term of imprisonment shall include the

specifically called for a period of parole ineligibility -- "85% <u>of the sentence</u> <u>imposed</u>" -- that has meaning only as it relates to a discretionary sentencing decision made by a court when setting the base term of a defendant's sentence. That base is changeable, and subject to being reevaluated, as <u>Rule</u> 3:21-10 clearly permits.

By allowing an application made under subsection (b)(2) to include a resentencing of defendant's base term, we would not be authorizing the vacating of defendant's NERA sentence. Rather, we would permit the motion court to perform the traditional sentencing function of reconsidering and resentencing a defendant. The defendant would be evaluated again, as in other resentencing settings, according to the aggravating and mitigating circumstances as applicable to defendant on the date of resentencing. <u>See</u> <u>State v. Randolph</u>, 210 N.J. 330, 354 (2012). One such mitigating factor is, of course, excessive hardship to defendant, N.J.S.A. 2C:44-1(b)(11), which

---

imposition of a minimum term. The minimum term shall be fixed at one-half of the sentence imposed by the court or 42 months, whichever is greater, or 18 months in the case of a fourth degree crime, during which the defendant shall be ineligible for parole."); <u>see also</u> N.J.S.A. 2C:13-1(c) ("[T]he term of imprisonment imposed under this paragraph shall be either a term of 25 years during which the actor shall not be eligible for parole, or a specific term between 25 years and life imprisonment, of which the actor shall serve 25 years before being eligible for parole . . . ."); N.J.S.A. 2C:15-2(b) ("A person convicted of carjacking shall be sentenced to a term of imprisonment and that term of imprisonment shall include the imposition of a minimum term of at least five years during which the defendant shall be ineligible for parole.").

10

would dovetail with the consideration of the <u>Priester</u> factors that warranted the reconsideration under subsection (b)(2).

I cannot agree to a construction of NERA that has transformed a moving period of parole ineligibility into an automatic set period, as if the statute had instead declared the parole ineligibility period to be five years or some other pre-ordained amount that is not subject to the exercise of judicial discretion in setting the base term from which the parole ineligibility percentage is derived.

The overall purpose of the restructuring of <u>Rule</u> 3:21-10 was to bring administrative control and efficiency to when the cutoff for applications to resentencing could be made. That reasoning permeates the 1975 Report.[3] The Rule was structured so as to limit the time for making such applications, but to allow certain reasons for permitting resentencing of a defendant beyond that point in time. Accordingly, this Court need not be constrained from amending subsection (b)(2) to permit reconsideration of the base term of an ill or infirm defendant in light of changed circumstances recognizable under <u>Priester</u>; and if, once that basis is reevaluated and a defendant has served the equivalent or more of 85% of that new base, he or she could be released under (b)(2).

---

[3] <u>E.g.</u>, <u>1975 Report</u> at 38-39 ("It is therefore suggested that <u>R.</u> 3:21-10(a) be revised to require the defendant to file at least a <u>timely</u> appeal if he is to have time following the appellate court's judgment to request a change of sentence.").

11

Contrary to the majority's assertion, that results in no violation of NERA's parole ineligibility period. This Court, through its own Rule, would be simply permitting another basis for a change in sentence -- which is within the innate authority of the court.

### III.

It bears recalling that we held out the promise of individualized relief under this Rule in a unanimous opinion only a short while ago. Yet today, the Court dashes such hopes for anyone serving a NERA sentence, taking the position that the Court's hands are tied.

In Matter of Request to Modify Prison Sentences, 242 N.J. 357 (2020), this Court unanimously recognized that Rule 3:21-10(b)(2) provided an avenue for seriously ill individual inmates to seek relief from the courts for release from their sentence of imprisonment. Id. at 380. And yet, no advocate could tell us during oral argument that even a single inmate has been able to secure that relief under our Rule. That result is all the more disappointing after we spelled out in that opinion our recognition that a Priester analysis should govern that indisputably extraordinary relief. Id. at 378-79. And we further recognized that the COVID-19 pandemic constituted a change in circumstances for purposes of bringing such an application. Id. at 379. What

12

the Rule did not do, we said, was provide a basis for a broad furlough program to be overseen by the Judiciary.  Id. at 378.

I would adhere to the view of our Rule as providing a source of relief for a defendant such as Chavies, who has never even had a hearing on the merits of his application, which was supported by a thousand pages of medical records and was further supplemented post-argument with even more medical information related to changing, and new, severe, medical needs.  The new legislation directing what the Department of Corrections must do for ill inmates who are near death or in similar dire straits, see ante at ___ (slip op. at 20) (discussing the Compassionate Release Statute, N.J.S.A. 30:4-123.51e), referred to in the majority opinion, in no way limits the scope of this Court's rulemaking and sentencing authority.  I am singularly unpersuaded that the enactment in any way should affect the relief available through the courts. What the Department of Corrections must do in responding to the needs of such inmates, as directed by the Legislature, does not preclude the courts from exercising a traditional sentencing function -- so long as this Court permits such applications to be heard, and does not bar them on the basis of a time limit we have chosen to put into place for administrative convenience.

For me, the proper frame for this appeal is the Rule and our authority to set procedures for the courts to exercise their continuing power to revisit and

13

resentence a defendant.  I see no conflict with NERA were we to recognize, under Rule 3:21-10(b)(2), a court's ability to resentence a defendant at any time post-conviction in connection with a showing under Priester's two-part standard for assessing a medical illness or injury and changed circumstances.

Subsection (b)(3) already pronounced a court's authority to resentence a defendant at any time post-conviction "for good cause shown" and the additional requirement of prosecutorial consent.  Having prosecutorial consent does not confer the ability to resentence.  Resentencing authority is reposed in the courts.  Consent is simply a limitation we imposed on an otherwise unlimited number of unchanneled applications by defendants outside of the time limit of subsection (a) of the Rule.  Indeed, an unintended consequence of the majority's view of the power to recognize when a resentencing of a base term may be accomplished is, although it does not say so, to wipe out the ability of the State to consent to a court's resentencing of a cooperating defendant that results in reducing any NERA sentence.  The majority's view of NERA's parole ineligibility period fails to acknowledge that it is only mandatory to the extent the court is satisfied with the base term it imposes, even on resentencing.

In sum, to the extent the reason advanced by a defendant under (b)(2) relates to a health concern, it is in our hands to deliver relief through an

14

amendment to the Rule. I would immediately amend our Rule with an interim order adjusting its language, with a permanent amendment to follow through the Criminal Practice Committee in the normal rule amendment process.[4] So long as a resentenced defendant is not released during the NERA parole ineligibility period of 85% of a resentenced base term, a defendant should be able to utilize an application under subsection (b)(2) to seek release for medical reasons controlled through the Priester analysis. NERA does not preclude a resentencing; it only precludes a release before 85% of the refixed base term is served in prison.

Thus, I would reverse and remand defendant's application and issue an interim order immediately revising the language of Rule 3:21-10(b)(2).

---

[4] This Court has used that procedure, or has taken it upon itself to amend rules itself. E.g., State v. Mercedes, 233 N.J. 152, 171-72 (2018); State v. Robinson, 229 N.J. 44, 71-74 (2017).

15